CHEHARDY, Judge.
Theresa Helm Walker appeals from a judgment decreeing that both she and her former husband, William E. Walker, Jr., were at fault in the termination of their marriage. She asserts the trial court abused its discretion in finding her at fault.
On January 14, 1983 Mrs. Walker filed a petition for separation, alleging cruel treatment by her husband, including but not limited to physical violence and excessive drinking. Mr. Walker answered by general denial and reconvened for separation. He alleged cruel treatment by Mrs. Walker, consisting of physical abuse, excessive drinking and verbal harassment.
On December 6, 1983 judgment of separation was granted in favor of Mr. Walker on the ground of living separate and apart for a period of six months. No determina *843 tion of fault was made at that time. Alimony pendente lite was continued pending a fault determination. (We note the record contains a second judgment of separation, rendered on December 9, 1983 and signed by a different judge, also decreeing a judgment of separation on the ground of living separate and apart for a period of six months. This anomaly does not affect the issues before us.)
On February 14, 1984 Mr. Walker filed a petition for divorce on the ground of living separate and apart for more than one year without reconciliation. Mrs. Walker answered by general denial and reconvened, asserting she was without fault and requesting permanent alimony. In response Mr. Walker alleged mental cruelty by Mrs. Walker, denying her right to permanent alimony.
On June 15, 1984 the issue of fault was tried and argued; the trial judge ruled from the bench that both parties were at fault. He also granted a divorce on the ground of living separate and apart for more than one year. The judgment was signed on June 25,1984. Mrs. Walker filed a motion for new trial on the fault issue, which was denied on September 25, 1984. In written reasons for judgment the trial judge stated,
“The wife alleges that the evidence of her fault is uncorroborated resulting in a failure of the husband to establish his case by a preponderance of the evidence. * * * However, the uncorroborated evidence was believable and persuasive. Many of the facts to be proved arose out of the private spousal relationship and were not readily subject to corroboration. The wife and her witnesses were present at trial. They offered no competitive refutation of the uncorroborated testimony limiting remarks to exposing his fault rather than defending her actions. Under these circumstances, such uncorroborated testimony constitutes a preponderance sufficient to support a judgment of divorce and a finding of mutual fault.

(Citations omitted.)
Mrs. Walker appealed the finding of fault against her; Mr. Walker neither appealed nor answered the appeal, therefore the judgment is fixed as to his fault. In her brief to this court, Mrs. Walker asserts the trial judge erred in believing Mr. Walker’s uncorroborated testimony concerning various aspects of their relationship and specific incidents upon which the allegations of fault were based. In particular she refers to several photographs depicting severe bruises and minor lacerations on her forearms she received in a fight with Mr. Walker two days before she filed her suit for separation.
According to the testimony, the parties married each other in January 1980 after prior marriages of many years’ duration. Mr. Walker’s first wife had died of cancer a few years earlier; apparently Mrs. Walker’s first husband had also died. Mrs. Walker has adult children from her first marriage.
The primary problems seem to have begun in August 1980, some eight months after the parties were married. Mr. Walker was abruptly terminated by his employer of 37 years, a steamship company. He admitted he “went into shock” and became severely depressed. Mrs. Walker testified he became moody and withdrawn, used obscene language constantly and called her vulgar names. Mr. Walker conceded he used obscenities frequently for a few months during the worst stage of his depression, but asserted he discontinued that behavior after about four months, once he found another job and his self-confidence returned.
He stated he called Mrs. Walker names only when extremely provoked by her nagging. He asserted that she would go into tirades in which she accused him of being an alcoholic, of making his first wife an alcoholic and “killing his wife” through alcoholism, and disparaged his mother.
Mrs. Walker testified that Mr. Walker drank excessively, one beer after another, but admitted that he rarely appeared intoxicated. Her son and daughter each testified that Mr. Walker drank a great deal of *844 beer in their presence; the daughter said he “had a beer in his hand” most of the time. She also confirmed her mother’s testimony relative to his constant use of obscene language. Neither she nor her brother testified to any specific incident of drunken behavior by Mr. Walker. Several other witnesses testified that Mr. Walker was a “social drinker” but that they had never seen him drunk.
One of Mrs. Walker’s major complaints against Mr. Walker was his friendship with a Mrs. Martin. She did not allege any illicit relationship but complained that he frequently went to dinner with Mrs. Martin or spent the evening at her home, without inviting Mrs. Walker along. Mrs. Walker admitted she and Mrs. Martin candidly disliked each other and stated that eventually she gave Mr. Walker an ultimatum, ordering him to choose between her and Mrs. Martin.
Mrs. Walker complained in particular of an incident in the latter part of 1982, when Mr. Walker went to Covington with Mrs. Martin and another lady and was gone until late that night. Mrs. Walker was highly affronted because she was not invited to go. That night, after telephoning in search of Mr. Walker and reaching him at Mrs. Martin’s home, she complained to Mrs. Martin of her unhappiness at Mr. Walker’s friendship with her. According to Mr. Walker, Mrs. Walker actually insulted Mrs. Martin to the extent that Mrs. Walker went personally to Mrs. Martin’s home the next day to apologize.
Mr. Walker testified that Mrs. Martin is a long-time family friend; he has known her for 40 years and she is old enough to be his mother. He admitted that during the last six months of his marriage to Mrs. Walker he had been staying out late at night without explanation to Mrs. Walker. He said it was because every time he came home he “encountered her daughter and her and the bitching would go on and on and on.”
The daughter, son and the son’s wife all testified that Mr. and Mrs. Walker seldom went places together, such as social or business functions, and often did not spend holidays together. According to Mrs. Walker and her children, Mr. Walker never gave her presents on gift-giving occasions and often seemed to deliberately “pick a fight” in advance of the occasion.
Mrs. Walker related an incident on which she prepared a Christmas dinner for him but he refused to come home to eat it. Mr. Walker stated he had not known she was planning to prepare dinner, because she usually did not cook. When he received a message through a third party that dinner was on the table, he did not want to go home because of the animosity between them.
Mrs. Walker also complained that Mr. Walker began going to bed at six or seven in the evening, waking up at three in the morning and forcing her to wake up also. Mr. Walker admitted that during the depressed period after he was terminated from his job he frequently woke up Mrs. Walker at two or three in the morning.
Mrs. Walker stated she began to sleep separately from Mr. Walker after he went into the depression and began using obscenities constantly. She said he would come downstairs like a child and say, “Please come upstairs, I’ll be good.” She would go upstairs and “he’d immediately start the same thing.” He would start talking in the middle of the night, threatening to kill people. She said she begged him to get professional help. She became very frightened and hid his gun. She admitted that after about a month he stopped the threats.
She also admitted his behavior improved to a degree after her daughter moved in with them in December 1980. His behavior improved also after he found another job.
She complained of occasions on which he spent evenings with Mrs. Martin or on which he stayed away from home until late at night. She complained that Mr. Walker would not leave messages or explanations to let her know where he would be, whereas she always left him a note. Mr. Walker admitted that Mrs. Walker did usually tell *845 him where she was going if she would not be at home with him.
Mrs. Walker’s son and daughter, as well as several other witnesses, testified that Mrs. Walker seldom drank alcoholic beverages and that they had never seen her drink to excess. Mr. Walker, however, described two separate incidents on which Mrs. Walker appeared intoxicated. On one occasion, he stated, she went into the back yard, sat on the patio and began singing and throwing her plastic glass about. He felt she must be disturbing the neighbors, so he went out to get her. He said he had to help her upstairs and she fell asleep in the bathroom.
The second incident he described occurred on January 12, 1983, the night of their wedding anniversary. He came home very late, around midnight, and found Mrs. Walker lying on the living room sofa, apparently asleep, with a bottle or glass of wine in her hand. There were broken glasses all around the fireplace. He said he went upstairs to go to bed, but heard her apparently awaken shortly thereafter. She made a telephone call to a neighborhood bar and asked if Mr. Walker was there. Upon being told no, she said, in a slurred voice, “Why won’t Bill come home?” She then telephoned her sister and brother-in-law and invited them over for a drink to celebrate her anniversary.
According to Mr. Walker, when his in-laws arrived he came downstairs. Then all of them sat for two hours discussing the marriage and the reasons for its deterioration. After the in-laws left, Mr. Walker went upstairs to bed and Mrs. Walker stayed downstairs to sleep on the sofa. About 20 minutes later she came upstairs. Mr. Walker assumed she wanted to have sexual relations. He told her he did not wish to continue the discussion and that he was going outside to sleep in the car. She then began verbally abusing him in the usual way, calling him an alcoholic and telling him he had killed his wife.
According to Mr. Walker, he then went into the dressing room to put on his clothes, whereupon Mrs. Walker came at him and said she was going to claw his eyes out. He stated he did not strike her, but held her by the forearms to keep her from getting at his eyes. He said she bruises very easily and that is why the photographs show the severe contusions. He said she scratched him badly on his forearms.
Mrs. Walker explained this incident as follows. She said she devised her “own little way” of proving to herself that Mr. Walker was “just plain mean and ornery.” She stated she believed he was deliberately trying to get her to leave him. She said she does not “like to believe the worst about anyone” until she is absolutely sure.
So, she stated, she had one glass of wine and deliberately broke exactly five glasses near the fireplace and in the fireplace. She sprinkled wine around the glasses and the fireplace, and sat on the edge of the sofa holding the bottle. She wanted to see if Mr. Walker, thinking she was inebriated, would let her stay on the sofa, knowing that when she got up she would step on the glass.
She denied that she was acting drunk; she attributed her slurred voice to a sinus condition and to the fact she had been crying. She heard him come in and go directly upstairs. She deliberately said, “Why doesn’t he come home?” so that he would hear her, hoping he would come downstairs.
When he did not, she wanted a witness to “the fact that he would let [her] walk on glass.” Accordingly, she telephoned her sister and brother-in-law and invited them over. Then Mr. Walker came downstairs and they had a long talk, until her brother-in-law left.
Afterwards, apparently, she accused Mr. Walker of “telling lies and innuendoes.” She recalled asking him how he could sit there and tell “such bald-faced lies,” and stated those were her exact words because she has “a habit of writing down everything” after she says it. She said he then “started with the name-calling”; she told him to stop and he turned. She admitted *846 slapping him, but denied that she went for his eyes as he had testified. She said he grabbed her and “tore [her] arms to pieces.” She admitted, however, that she has a medical problem that causes her skin to be extremely tender, but claimed he “virtually ripped [her] arms to pieces.” She admitted she “had at his arm” but didn’t think she did more than “scratch the surface.”
After this incident, she said, she filed the separation suit. She had photographs taken of her bruised arms on her attorney’s advice. The separation suit was filed on January 14 and she had gone to see her attorney on the 13th. (The incident took place on the morning of the 13th.)
Mr. Walker testified, in rebuttal, that on both the night of January 13 and 14, following the scratching incident, Mrs. Walker came to him and requested sexual relations; she had never done this before. He complied on both occasions. He said that after they had completed relations on the night of the 14th, she informed him that she was filing for separation the next day.
He also testified that when she would start her "bitching,” he would plead with her to stop but she kept it up. She would start it every night when he came home from work. Finally he would leave the house because he could not take it any more. He also claimed she called some of his friends and made up lies about him; that she called his clients and interfered with his business associations. He complained further that Mrs. Walker opened all his mail despite his requests to allow him to see it first.
He related two incidents in which she threw a glass of wine or a can of beer at the bedroom wall. On one of these occasions she pushed all the items off his dressing table with a swipe of her arm, then went downstairs to the kitchen and did the same thing to the counter.
One of Mr. Walker’s major complaints was the presence of Mrs. Walker’s daughter in their home. She lived with them on and off for periods of several months at a time. Among the inconveniences Mr. Walker complained were caused by her presence was Mrs. Walker’s refusal to have sexual relations with him when her daughter was in the house. In fact, he said, from the time her daughter came into the house Mrs. Walker occupied a bedroom separate from his. He said, “It was almost like making a date for sex.”
Mr. Walker said he came to the conclusion that from the first day Mrs. Walker had begun the relationship with him with money in mind. As an example, he said, within a couple of months after Mrs. Walker filed the suit for separation, she came to him and offered to reconcile, on the condition that he establish a $150,000 irrevocable trust in her name. Mr. Walker also alleged he had discovered, after the separation suit was filed, that Mrs. Walker had been keeping a diary in which she “kept dates” for the purpose of “building a case,” as he termed it.
Mr. Walker admitted that during the time of his severe depression Mrs. Walker had reason to be angry or upset. He admitted that on some occasions, when in the grip of the depression, he even threatened to kill her. He said, however, that it was just a figure of speech. He said that once he regained steady employment and got over the initial shock and depression, he was “not an unreasonable person to live with at all.” He also testified that on occasion he went to social functions without her, but said she too went to functions without him.
Mr. Walker also complained that Mrs. Walker disliked his friends and frowned on social gatherings that included drinking. He complained that she did not cook and would buy precooked food when they entertained at home.
Only a spouse who “has not been at fault and has not sufficient means for support” is entitled to., permanent periodic alimony after divorce. LSA-C.C. art. 160. The spouse who claims entitlement to permanent alimony bears the burden of proving that he or she was without fault in the breakup of the marriage. Slaughter v. *847 Slaughter, 436 So.2d 1352 (La.App. 3 Cir.1983).
Only such conduct as will entitle one spouse to a separation or divorce under the Civil Code articles is sufficient to deprive the other spouse of alimony after a final divorce. Adams v. Adams, 389 So.2d 381 (La.1980). A spouse is not deprived of alimony after divorce simply because that spouse was not totally blameless in the marital discord; to constitute fault sufficient to deny alimony, the spouse’s misconduct must not only be of a serious nature, but must also be an independent contributory or proximate cause of the separation rather than a justifiable or natural response to initial fault on the part of the other spouse. Oliver v. Oliver, 393 So.2d 192 (La.App. 1 Cir.1980), writ denied 397 So.2d 1358. See also, Pearce v. Pearce, 348 So.2d 75 (La. 1977); Vail v. Vail, 390 So.2d 978 (La.App. 2 Cir.1980). The issue of fault in the dissolution of a marriage is factual and the trial court’s resolution of this issue will not be disturbed unless it is clearly wrong. Lamb v. Lamb, 460 So.2d 634 (La.App. 3 Cir.1984).
The issue we must decide is whether the trial judge was clearly wrong in concluding Mrs. Walker was at fault. Viewing all the evidence in light of the jurisprudence, we find no manifest error in his conclusion. Many of Mrs. Walker’s actions went beyond mere “natural reaction” to Mr. Walker’s behavior. Some of her actions even imply deliberate intent to place Mr. Walker in a position of wrongdoing — an “entrapment” of sorts. Although none of the incidents related by Mr. Walker would individually have been sufficient ground for separation, taken as a whole Mrs. Walker’s conduct was sufficient to constitute an independent contributory cause of the separation.
As did the trial judge, we find Mrs. Walker failed to carry her burden of proving freedom from fault. The uncorroborated portions of Mr. Walker’s testimony, as the trial judge remarked, was subject to a credibility determination by the trier of fact. The judge found it credible and we see no reason to reverse him.
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed equally against the parties.
AFFIRMED.