487 So.2d 681 (1986)
Connie Skaggs VAUGHN
v.
Keith Harold VAUGHN.
No. 85-CA-690.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1986.
*682 Bennett Wolff, New Orleans, for plaintiff-appellee.
A. Bruce Netterville, Gretna, for defendant-appellant.
Before KLIEBERT, BOWES and GAUDIN, JJ.
KLIEBERT, Judge.
This is a devolutive appeal by Keith Vaughn, the husband, from a judgment rendered in favor of Connie Skaggs Vaughn, the wife, decreeing, among other matters, a divorce, child support of $1,000.00 per month, and finding the wife free of fault in the marital dispute, but denying her permanent alimony. We affirm.
This marital litigation commenced in August 1983 when the wife filed a petition for separation from bed and board alleging abandonment and cruel treatment. Following a hearing, by judgment dated October 14, 1983, alimony pendente lite for the wife was set at $600.00 per month. The same judgment required the husband to pay child support of $550.00 per month for each of the two minor children of the marriage, a nine year old boy and a four year old girl. Subsequently, the husband, a police officer, was shot while on duty. On his motions for a reduction of child support and alimony pendente lite, by judgment dated May 14, 1984, the alimony pendente lite was reduced to $250.00 per month and the child support for both minor children was reduced to $750.00 per month.[1] Although an appeal of the May 14, 1984 judgment was granted to the husband, this appeal was subsequently dismissed by the district court for non-payment of the appeal cost.
On July 15, 1984 the husband filed a reconventional demand alleging the wife's fault, cruel treatment, and constructive abandonment in April 1983 and praying for a full divorce. Thereafter, the wife, on September 5, 1985, filed a petition alleging she was free of fault, her abandonment by the husband in April 1983 and the spouses continued separation without a reconciliation for over a year following the abandonment. The petition prayed for a full divorce, custody, permanent alimony, child support and use of the family home. The record contains various rules for contempt, alimony arrearages and enforcement of child support filed against the husband prior to and subsequent to the reduction in alimony pendente lite and child support payments fixed by the May 14, 1984 judgment.
*683 When the case was called on December 12, 1984, apparently on a rule to increase child support, after some discussion between the trial judge and the attorneys for the parties, it was agreed several of the outstanding rules would be tried along with the fault issue and the parties' entitlement to a divorce based on their having lived separate and apart for one year without a reconciliation. Following this hearing the trial judge rendered the judgment of May 2, 1985, which is the subject of this appeal. Although the judgment decreed other matters, on appeal the husband assigned error only to the trial court's decree absolving the wife of fault and setting the child support at $1,000.00 per month.

FAULT
The husband's version and the wife's version as to the marital dispute are diametrically opposite. According to the husband, the wife was highly disagreeable before their separation. He testified there were many episodes where she would start arguing, cursing and then start hitting, spitting and throwing things. In most instances the fight was over his desire to take the children to his parents' home. Although the wife admits to having what she categorizes as the usual family arguments, she contends their marital relationship was very close and loving until April of 1983.
As to the events leading to the separation on April 13, 1983, the wife said she saw her husband and another police officer laughing, talking and otherwise "carrying on" in a parking lot with two females. She blew her horn to attract his attention and called him over and according to her had a normal conversation. Also, according to her, when he got home from work about 3:30 P.M. he was not very talkative and left for his detail (a sideline job) shortly after his arrival from his regular work. When he returned home at about 9:30 that night he wasn't very talkative but said things did not appear to be working out so he told her he was leaving home to "get his head together". He then packed his suitcase and left.
In contrast, the husband says that during the day which led up to his being pushed out of the house, he received a message from central lock-up to call his wife at home. When he called, his wife said she was fed up with him, his children and his job and unless he complied with her request to come home she would go to his headquarters to cause trouble in an effort to get him fired. He contends they spoke on the phone for forty-five minutes to an hour, with her continuously yelling and screaming. When he got home from work he talked to her for a long time trying to calm her down before he left to go on a detail. While on the detail she again called him on the phone, threatened to have him fired and again insisted she was fed up with him, his children and his job. When he told her that if she continued to carry on, one day he would leave. In response, she said "Get the hell outnobody wants you anyway." To this he claims to have responded "If you pack my bags I'll leave." When he got home about 9:00 o'clock she opened the door, set a packed bag outside the door and said "Kids, kiss your dad good-byhe's leaving." When she again informed him she wanted him to leave, he left.
The husband testified to several other instances which occurred subsequent to his leaving the home. All of these are basically denied by the wife except for an incident at the husband's apartment at the Harper's Ferry Apartment Complex. According to the husband the wife came to his apartment at the Harper's Ferry Apartment Complex on May 14, 1985, uninvited. According to the wife, her purpose was to visit and discuss their mutal problems. Upon arriving at the apartment she put her hand over the "peephole" and knocked. While waiting for the door to open she could hear her husband talking to someone inside the apartment. When the husband opened the door she saw a female lying on the couch. The woman got up and started walking towards the door. The wife admits to then pushing her out while justifying *684 her action with the contention she was aggrieved and became distraught on seeing her husband of some twelve years with another woman. Thereafter, depending upon whose version is accepted, an argument and name calling session or a discussion ensued for some 5 to 7 hours in which the husband's parents were called to come over and in which bottles were broken, debris scattered on the floor and the apartment put in total disarray. Although the wife denies it, the two hundred pound husband contends he took a "tail whipping" at the hands of his wife for 5 to 6 hours, which left his "lip busted", his "groin black and blue", and his being unable to work the next day due to the injuries sustained.
The husband, the female in the apartment and her female friend all said she was in the apartment waiting for her friend who lived in the same apartment complex to come and pick her up to go shopping. Although the husband reluctantly agreed the female was his girl friend and had stayed in the apartment overnight on several occasions, he denied having had sexual relations with her at any time.
Although the trial judge did not give written reasons for his judgment, he rejected the husband's argument of mutual fault. He specifically found the wife was free of fault but not entitled to permanent alimony.
Under our jurisprudence, the fault necessary to preclude a spouse from receiving permanent alimony has been interpreted to mean conduct constituting an independent fault ground for separation under Civil Code Articles 138 and 139. See Adams v. Adams, 389 So.2d 381 (La.1980); Helm v. Walker, 477 So.2d 842 (5th Cir.1985). Further, a spouse is not deprived of permanent alimony simply because she/he was not totally blameless in the marital discord. To constitute fault, a spouse's misconduct must not only be of a serious nature, but must also be an independent contributory or proximate cause of the marital discord rather than a justifiable or natural response to the primary fault of the other spouse. See Pearce v. Pearce, 348 So.2d 75 (La.1977); Bruner v. Bruner, 364 So.2d 1015 (La.1978); Benoit v. Benoit, 466 So.2d 561 (5th Cir.1985); Helm v. Walker, supra; Oliver v. Oliver, 393 So.2d 192 (1st Cir. 1980).
On appeal counsel for the wife argues: (1) For the wife's acts to constitute sufficient fault to bar her right to receive permanent alimony under the provisions of Civil Code Article 160, the acts of cruelty must have occurred prior to April 14th, 1983, the date on which the parties were physically separated. This is so because under Article 138, for the cruelty to be a ground for separation, it must be such as to render the spouses continued living together unsupportable; (2) Alternatively, even if post separation acts are to be considered in determining fault, the wife's behavior here was not of such a serious nature as to be an independent contributory or proximate cause of the separation because they were justifiable and a natural response to the husband's primary fault.
We do not agree with the wife's contentions that the actions of the wife subsequent to their physical separation cannot constitute fault for the purpose of barring her from permanent alimony. In Schwartz v. Schwartz, 472 So.2d 115 (5th Cir.1985), this court said that if post separation actions could have no bearing on the issue of fault, for purposes of permanent alimony, ".... a spouse not adjudged at fault in the separation might well be inclined to act vindictively toward the other, secure in the knowledge that his or her right to permanent alimony could not thereby be affected" and hence would be contrary to the legislative intent in providing a waiting (cooling off period) between separation and divorce. In the same discussion the organ of this court further pointed out that for post separation faults based on intemperance, cruel treatment or outrages to serve as a basis for a denial of permanent alimony the acts complained of must truly be cruel and outrageous and surely in the spirit of vindictiveness. Thus, the actions of the wife subsequent to the physical separation here must be viewed in this light.
*685 From the trial judge's questions and the answers received, it is apparent the husband was evasive and gave testimony at the December 13, 1984 hearing which was different from testimony he had given in prior hearings, particularly as to his income and prior payment of court-ordered child support and alimony. Since the testimony of each party was diametrically opposed, it was necessary for the trial judge to make a credibility call. Although the trial judge did not furnish written reasons for his decision, it is apparent from his rulings that he considered the wife's testimony more credible than that of the husband.
In the area of domestic relations much discretion is left in the trial judge, particularly in evaluating the weight of the evidence which is to be resolved primarily on the basis of credibility of the witnesses. Pearce v. Pearce, supra. Considering this standard of review and the record before us, we cannot say the trial judge erred in finding the wife was free from fault.

CHILD SUPPORT
The wife had a gross income of $650.00 per month. Although she admitted to some overtime, there is no evidence to indicate how much overtime she did earn. The husband's earnings for an eleven month period, including overtime ($456.00) and details (extra work which, according to his counsel, are no longer available to him), was $24,597.58 or roughly $2,218.00 per month.
The wife submitted a list of expenses for herself and the two children of the marriage at $3,080.85 per month and included amounts for her legal expenses in the marital litigation. She included in these expenses a house note of $341.15 which was apparently the monthly payment on a community owned house which the wife and children were occupying. The expenses on the husband's list totaled $907.00 per month which included $350.00 for a house note or rent.
Counsel for the husband's arguments for a reduction on appeal are primarily based on a comparison of the income and expenses when the alimony pendente lite and the child support payments were originally set and then reduced by the May 14, 1984 judgment and the income and expenses at the time of the hearing which resulted in the May 2, 1985 judgment.
Although the record before us does not reflect the amount the husband normally earned from overtime and details, there is evidence indicating the amount was substantial. However, the eleven month period used to compute gross income here included the period the husband was hospitalized or convalescing from gunshot wounds. The husband, however, testified that he had served on details subsequent to the shooting, but was not doing so at the time of the hearing.
Based on the evidence before us, we cannot say the trial judge erred in refusing to grant to the wife permanent alimony (apparently based on the lack of need) and in setting child support at $1,000.00. Since it is apparent the payment of the monthly house note has been a controversial issue between the spouses, perhaps from a practical matter more problems would have been solved by granting the wife permanent alimony and requiring her to pay the house note and then reducing the amount of child support. However, the wife did not appeal or answer the appeal, hence, we cannot alter the original judgment refusing to grant her permanent alimony. Thus, considering the fact the wife has to pay $341.15 on the house note or pay rent of a similar amount for shelter for herself and the children, we cannot say the trial judge erred in setting the child support at $1,000.00 per month.

CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court. All costs are to be borne by the appellant.
AFFIRMED.
NOTES
[1] The transcript of the hearing fixing the original and the subsequently reduced alimony pendente lite and child support payments are not part of the record before us.